JS-6

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

GLORIA CARRIER,

       Plaintiff,

   v.

AETNA LIFE INSURANCE COMPANY,

       Defendant.

Case No. CV 14-03932 BRO (FFMx)

**FINDINGS OF FACT AND CONCUSIONS OF LAW AFTER COURT TRIAL**

## I.      <u>INTRODUCTION</u>

This action falls under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*  Plaintiff Gloria Carrier is a fifty-five-year-old woman who previously worked for Bank of America as a Credit Administrator. Through her position at Bank of America, Plaintiff enrolled in an employee welfare benefit plan that provides disability benefits to the bank's employees.  Defendant Aetna Life Insurance Company administers this plan, which provides for both short-term disability ("STD") benefits and long-term disability ("LTD") benefits.

After being diagnosed with uterine cancer, Plaintiff underwent surgery and chemotherapy, which led her to develop significant neuropathy and become severely depressed.  As a result, Plaintiff took a leave of absence from work and submitted a claim for STD benefits in August 2011.  Defendant granted that claim, and Plaintiff received STD benefits for some time.  When Plaintiff reached the maximum allowable number of weeks for STD benefits under her policy, Defendant began evaluating Plaintiff's eligibility for LTD benefits.  Finding her to be eligible, Defendant provided Plaintiff with LTD benefits beginning on February 10, 2012. On July 11, 2013, however, Defendant terminated Plaintiff's LTD benefits after determining that she no longer met the policy's definition of disability.

Through an attorney named Donald Cooper, Plaintiff appealed this termination of benefits in August 2013.  Mr. Cooper submitted a number of Plaintiff's medical documents to Defendant in support of her appeal, but Defendant rejected Plaintiff's appeal on February 7, 2014, upholding its termination of Plaintiff's LTD benefits. Believing that Defendant wrongfully withheld benefits due under the disability insurance policy, Plaintiff filed the instant action.  She now seeks review of Defendant's termination of her LTD benefits.

After a *de novo* review of the record and argument of counsel, the Court finds that Plaintiff is entitled to LTD benefits under the policy, and consequently that Defendant's termination was improper.  Accordingly, judgment is for Plaintiff.

## II.    FINDINGS OF FACT[1]

### A.    The Policy

Plaintiff began working for Bank of America on July 30, 2010, when she was hired as a Credit Administrator.  (AR0421.)  As a Credit Administrator, Plaintiff's role at Bank of America entailed "[s]upervis[ing] and coordinat[ing] activities of workers engaged in processing and recording commercial, residential, and consumer loans," which involved minimal physical requirements such as occasionally "lifting, carrying, pushing, [and] pulling 10 Lbs."  (AR0721.)  Plaintiff's job "[m]ostly" involved "sitting," although it also included "standing or walking for brief periods of time."  (AR0721.)  Accordingly, the physical demand level listed for her position is "sedentary."  (AR0421.)  Nevertheless, the position also involves "[c]ommunicat[ing] risk analysis clearly through written and oral communication," "[i]dentify[ing] problems on credit-related issues, guidelines & policies," performing research on closed loans, and supervising between twenty and 100 people across multiple states.  (AR0503, 0694.)

As a Bank of America employee, Plaintiff enrolled in the employee welfare benefits policy administered by Defendant.  (*See* AR0017–99.)  This policy provides for both short-term and long-term disability benefits.  (AR0012.)  Pursuant to this policy, an employee may seek STD benefits for up to twenty-six weeks, after which the employee may apply for LTD benefits.  (AR0348–49.)  To be eligible for LTD benefits, an employee must meet the definition of "disability" under the policy:

> From the date that you first became disabled and until monthly benefits are payable for 18 months you meet the test of disability on any day that:
>
> - You cannot perform the **material duties** of your **own occupation** solely because of an illness, injury or disabling pregnancy-related condition; and

---

[1] Any finding of fact which constitutes a conclusion of law is hereby adopted as a conclusion of law.  Unless otherwise noted, all citations will be to the administrative record in this matter.

- Your earnings are 80% or less of your **adjusted predisability earnings**.

  *After the first 18 months of your disability* that monthly benefits are payable, you meet the plan's test of disability on any day you are unable to work at any **reasonable occupation** solely because of an **illness, injury** or disabling pregnancy-related condition.

(AR1658.)  It further states: "The loss of a professional or occupational license or certification that is required by your own occupation does not mean you meet the test of disability.  You must meet the plan's test of disability to be considered disabled."  (AR1658.)  As for the definition of "own occupation," as referenced in this provision, the policy defines that term as:

> The occupation that you are routinely performing when your period of disability begins.  Your occupation will be viewed as it is normally performed in the national economy instead of how it is performed:
>
> - For your specific employer; or
> - At your location or work site; and
> - Without regard to your specific reporting relationship.

(AR1673.)  The policy also defines the term "reasonable occupation" as "any gainful activity . . . [f]or which you are, or may reasonably become, fitted by education, training, or experience," and "[w]hich results in, or can be expected to result in, an income of more than 60% of your **adjusted predisability earnings**."  (AR1675.)

Finally, the policy limits LTD benefits that result from a mental or psychiatric condition.  Specifically, the policy states than an employee "will no longer be considered as disabled and eligible for long term monthly benefits after benefits have been payable for 24 months if it is determined that [his or her] disability is primarily caused by" either (1) "[a] mental health or psychiatric condition, including physical manifestations of these conditions, but excluding conditions with demonstrable, structural brain damage," or (2) "[a]lcohol and/or drug abuse."  (AR1660.)

**B.    Plaintiff's Diagnosis**

In 2009, Plaintiff was diagnosed with Stage 3C/4A uterine cancer.  (AR0966, 1090–91.)  On June 24, 2009, Plaintiff underwent surgery to remove her uterus.  (AR1091.)  She then underwent three cycles of chemotherapy, which led her to

develop significant neuropathy.  (AR1090.)  Following this treatment, Plaintiff saw Dr. Andrew Seltzer, M.D., who, on July 27, 2011, reported that Plaintiff "recently has developed constant tingling and numbness from her elbows to her hands and her feet.  She feels like something is smashing every part of her limbs.  She reports weakness in the hands.  In the past three or four months things have escalated.  She is also having abdominal and rib cage pain."  (AR0943.)  Dr. Seltzer subsequently diagnosed Plaintiff with chronic myofascial pain syndrome and thoracic spine pain in a report dated August 31, 2011.  (AR0947.)

### C.   Plaintiff's Receipt of STD Benefits

On August 12, 2011, Plaintiff took a leave of absence from work.  (*See* AR0895.)  She then submitted a claim for STD benefits pursuant to the employee welfare benefits policy on August 25, 2011.  (AR0895.)  Although Defendant initially sent Plaintiff a letter denying Plaintiff's claim on September 12, 2011, (AR0930–31), Defendant sent Plaintiff another letter that same day approving of her claim for STD benefits, (AR0932–34).  Plaintiff's STD benefits were effective beginning August 19, 2011, with Defendant to monitor her claim.  (AR0932.)

On September 29, 2011, Dr. Philip Corrado, Ph.D., completed a series of diagnostic tests on Plaintiff.  (AR1087–1119.)  Following these tests, Dr. Corrado observed: "Ms. Carrier was administered a clinical interview and given a battery of cognitive, motor, perceptual, and personality assessments.  This evaluation can be considered an accurate reflection of Ms. Carrier's current level of functioning." (AR1094.)  The tests run by Dr. Corrado revealed that Plaintiff "performed poorly on tasks which tapped working memory," that she demonstrated "deficits in executive functioning," and that she "me[t] the diagnostic criteria for pain disorder."  (AR1114, 1117.)  Consequently, Dr. Corrado concluded that Plaintiff "should be considered totally disabled on a psychiatric basis at th[at] time."  (AR1118.)

Defendant wrote Plaintiff a letter on October 12, 2011, informing her that her STD benefits had been terminated because her recent medical reports indicated that

her condition had improved "due to an excellent response from trigger point injections." (AR0964–65.) After Plaintiff appealed, however, Defendant overturned its decision on the basis that, although Plaintiff had undergone "8 trigger point injections," she nevertheless "only obtained temporary relief."[2] (AR1017–18.) Defendant then provided STD benefits through February 9, 2012. (AR1122–23.)

On May 15, 2012, Defendant's personnel wrote a note in Plaintiff's file stating that there was no medical information to support a continued absence. (AR0466.) Shortly thereafter on May 18, 2012, Dr. Seltzer submitted an Attending Physician Statement to Defendant in which he determined that Plaintiff remained unable to work due to "thoracic pain, rip pain, lumbar pain, and cervicalgia." (AR1064–65.) Dr. Corrado also submitted a letter to Defendant on Plaintiff's behalf, opining that it was "completely unfair and an unreasonable expectation" that Plaintiff had been subjected to deadlines related to the benefits policy of which she was not previously "given [Plaintiff's] physical, psychiatric, as well as neurocognitive deficits." (AR1253–54.) Dr. Corrado further stated that, "due to the fact that [Plaintiff] is disabled, [Defendant] cannot expect her to meet arbitrary deadlines." (AR1254.) Despite this correspondence and Defendant's notations, it does not appear that Defendant ceased providing Plaintiff with STD benefits.

**D.    Plaintiff's Claim for LTD Benefits**

In an August 10, 2012 letter, Defendant informed Plaintiff that she would "soon reach the maximum number of weeks for short-term disability benefits under [her] plan," and that Defendant was "reviewing [her] claim to determine [her] eligibility for [LTD] benefits." (AR1127.) Defendant wrote to Plaintiff again on

---

[2] Defendant wrote a similar letter to Plaintiff on January 6, 2012, again informing her that her STD benefits had been terminated on the basis that "the clinical information received did not indicate any updated objective clinical information that would substantiate that [Plaintiff was] functionally impaired from a sedentary job or unable to perform the essential functions of [her] job as a Credit Administrator." (AR1031–32.) After Dr. Corrado called on Plaintiff's behalf and learned that the reason for the termination was that a form "was incorrectly signed by a physician's assistant," Dr. Corrado assisted Plaintiff in completing the form, (AR1276), and Defendant overturned its denial, (AR0602).

August 28, 2012, noting that the LTD Benefits Manager had been attempting to contact her to discuss her LTD benefits claim.  (AR1160.)  That same day, Defendant sent Plaintiff a consent form that she needed to fill out to be eligible for LTD benefits.  (AR1161–62.)  On September 10, 2012, Defendant wrote to Plaintiff advising her that she needed to complete and return certain forms by October 9, 2012 in order to be eligible for LTD benefits.  (AR1163–87.)  On September 13, 2012, Dr. Corrado faxed a letter to Defendant stating that Plaintiff remained "temporarily totally disabled . . . and [was] not able to return to her work duties," noting that "[h]er expected return to work date is November 15, 2012."  (AR1189–90.)

In support of this conclusion, Dr. Corrado submitted a Behavioral Health Clinician Statement on September 24, 2012, in which he stated that his rationale for recommending disability leave was Plaintiff's "major depression" and "cognitive disorder."  (AR1199–1200.)  Dr. Corrado also opined that Plaintiff's reasoning and judgment were impaired, noting: "jumping to conclusions; [t]hinks she will be better off dead; engages in catastrophic thinking; overgeneralizes."  (AR1199.)  Defendant responded to Plaintiff on September 27, 2012, advising her that Defendant was unable to complete its review of Plaintiff's claim within forty-five days "[d]ue to [Plaintiff's] delay in sending the requested information," but that Defendant expected to be able to make a decision by October 21, 2012.  (AR1201–02.)  On October 18, 2012, Defendant wrote to Plaintiff, indicating that Plaintiff was "eligible to receive monthly benefits effective February 10, 2012 and continuing for up to 18 months, so long as [she] remain[ed] disabled from [her] own occupation."  (AR1206–07.)

Defendant wrote Plaintiff another letter on January 15, 2013, advising her that its personnel had been trying to reach Plaintiff to discuss her current condition and any changes to the treatment of her condition.  (AR1217.)  That same day, Defendant sent Plaintiff a letter advising her of the upcoming change in the definition of "disability" under the policy from "own occupation" to "any occupation" on August 10, 2013 (eighteen months after February 10, 2012), and requesting information to

7

1    enable Defendant to evaluate her claim under this new standard.  (AR1218–19.)

2    Defendant also submitted a request for all of Dr. Corrado's records for Plaintiff on

3    January 23, 2013, (AR1220), which he provided on January 24, 2013, (AR1228–29).

4    Dr. Corrado's office notes spanned the timeframe between October 20, 2011 and

5    January 10, 2013.  (AR1228–29.)  On February 26, 2013, Defendant sent Plaintiff a

6    letter confirming that Plaintiff remained "totally disabled from [her] own

7    occupation" and thus remained eligible for LTD benefits at that time.  (AR1324–26.)

8         Dr. Corrado faxed Defendant additional medical records on May 20, 2013,

9    which included a completed questionnaire sent to Plaintiff by Defendant, an updated

10   Clinical Assessment of Depression ("CAD"), and office visit notes from April 18,

11   2013, April 25, 2013, and May 2, 2013.  (AR1331–41.)  In the questionnaire, which

12   Dr. Corrado completed on May 8, 2012, Dr. Corrado opined that Plaintiff was

13   "completely and totally disabled" owing to the fact that she was suffering from

14   "severe depression [and] severe cognitive impairment."  (AR1333.)  In the CAD,

15   which is "a 50-item self-report instrument that is comprehensive, highly reliable, and

16   sensitive to depressive symptomatology," Plaintiff's total CAD score "placed her in

17   the 99th percentile[,] indicating that her overall CAD score f[ell] within the range

18   over very significant clinical risk."  (AR1334–35.)  Similarly, Dr. Corrado's office

19   notes from April and May 2013 indicated that Plaintiff was suffering from

20   depression, that she was "extremely concerned that there may be a reemergence or

21   reoccurrence of cancer," and that she had had suicidal ideations.  (AR1336–41.)  Dr.

22   Corrado advised Plaintiff during the May 2, 2013 session to make an appointment

23   with a psychiatrist named Dr. Karme.  (AR1337.)

24        Defendant ordered a peer evaluation of Dr. Corrado's conclusions, which Dr.

25   Elana Mendelssohn, Psy.D., completed on June 20, 2013.  (AR1342–49.)  In her

26   report, Dr. Mendelssohn described how she reviewed Dr. Corrado's medical

27   documentation with regard to Plaintiff and consulted with Dr. Corrado via

28

teleconference.  (AR1346–47.)  Based on her evaluation, Dr. Mendelssohn provided the following summary of her analysis of Plaintiff's cognitive impairment:

> The provided information indicates a history of depression and cognitive difficulties.  The claimant has been in treatment with a psychologist [Dr. Corrado] since 2011 who has firmly opined that the claimant was permanently disabled due to her emotional and cognitive state.  This provider completed a neuropsychological evaluation with the claimant between 2011 and 2012 which documented reductions in the claimant's cognitive performance.  Although in recent peer-to-peer consultation it was his opinion the claimant suffered from significant neuropsychological deficits, in reviewing the previous neuropsychological evaluation, the claimant's test performance was not indicative of impairment across the neurocognitive domains.  While the claimant's performance was suggestive of areas of weakness, her scores across these domains did not consistently fall within the impaired level.  More recently, it was noted that the claimant was administered a cognitive screening measure at which time she demonstrated variable attention.  *However, it is my opinion there is a lack of specific examination findings and behavioral observations to clearly substantiate the claimant's current cognitive functioning.*
>
> It has also been opined by the treating psychologist that the claimant has continuously suffered from severe depression.  In his more recent office note he indicated the presence of suicidal ideation without plan and/or intent.  Yet in peer-to-peer consultation, he noted the claimant was "extremely suicidal" which is then not consistent with his office notes.  Moreover, there was no indication that the claimant has been referred for greater intensity of care due to risk concerns, particularly given that the claimant reportedly will not attend these types of programs.  However, it is my opinion that if an individual was significantly at risk for self-harm that the claimant would need to be hospitalized involuntarily and there was no indication that this has taken place.  Additionally, the treating psychologist continues to opine that the claimant suffers from severe depression.  Although it is noted that she tends to present as dysphoric and tense, affect has continued to be appropriate and there was no indication of emotional dyscontrol or behavioral abnormalities.  While the provided information suggests the presence of ongoing depression and emotional distress, it is my opinion the provided information did not include specific examination findings or clear and consistent description of the claimant's clinical presentation to substantiate the presence of impairment in psychological functioning that would prevent the claimant from performing her own or any job duties. *Taken together, the provided information does not include sufficient findings to support the presence of a functional impairment from 5/1/13 through 8/31/13.*

1   (AR1346–47 (emphasis added).)  Dr. Mendelssohn further opined that no restrictions

2   or limitations were medically appropriate, and that there "were no examination

3   findings of any functional impairment suggesting that the claimant's ability to work

4   was directly impacted by an adverse medication effect, from a psychological

5   standpoint."  (AR1346–47.)

6         On July 11, 2013, Defendant notified Plaintiff of its decision to terminate

7   Plaintiff's LTD benefits based on its determination that she no longer met the

8   definition of disability.  (AR1350–52.)  After restating the terms of the policy, the

9   letter informed Plaintiff that in addition to considering clinical information submitted

10   by Dr. Corrado, Defendant "had an independent physician specializing in Psychiatry

11   review the clinical information available in the [sic] and contact Dr. Corrado

12   telephonically."  (AR1350–51.)  After noting Dr. Corrado's opinion that Plaintiff

13   "cannot work because [Plaintiff is] completely and totally disabled due to severe

14   depression and severe cognitive impairment most likely due to chemotherapy,"

15   Defendant nevertheless concluded that "there [we]re insufficient medical findings

16   documented to support a level of functional impairment that would preclude

17   [Plaintiff] from performing the sedentary physical demand duties of [her] own

18   occupation as a Credit Administrator."  (AR1351.)  The letter explained:

19        Our independent reviewer (Psychiatrist) indicated that during a recent
20        peer-to-peer consultation with Dr. Corrado, it was Dr. Corrado's
          opinion the [sic] you suffered from significant neuropsychological
21        deficits; however, in reviewing the previous neuropsychological
          evaluation, your test performance was not indicative of impairment
22        across the neurocognitive domains.  Your scores across these domains
          did not consistently fall within the impaired level.  More recently, it
23        was noted that you were administered a cognitive screening measure
          at which time you demonstrated variable attention.  It is the reviewer's
24        opinion that there is a lack of specific examination findings and
          behavioral observations to clearly substantiate your current cognitive
25        functioning.  It has also been opined by Dr. Corrado that you have
          continuously suffered from severe depression and that you were
26        "extremely suicidal," however there was no indication that you have
          been referred for greater intensity of care due to risk concerns,
27        particularly given that you reportedly have decided that you will not
          attend these types of programs.  While the provided information
28        suggests the presence of ongoing depression and emotional distress, it

is the reviewer's opinion that the provided information does not include specific examination findings, or clear and consistent description of your clinical presentation, to substantiate the presence of impairment in psychological functioning that would prevent you from performing your own or any job duties.

(AR1351.)  The letter then informed Plaintiff of her right to appeal the decision, noting that Defendant would review any additional information that Plaintiff wished to submit.  (AR1352.)  It further informed Plaintiff of her right to bring a civil action under ERISA.  (AR1352.)

### E.   **Plaintiff's Appeal**

Following Defendant's termination of Plaintiff's LTD benefits, Plaintiff wrote to Defendant in August 2013 to appeal the decision, informing Defendant that her attorney, Don Cooper, would be following up with Defendant on her behalf. (AR1371–72.)  Mr. Cooper sent Defendant a letter, dated August 28, 2013, appealing the termination of Plaintiff's LTD benefits.  (AR1366–70.)  Attached to this letter was a report authored by Dr. Corrado on August 15, 2013, in which Dr. Corrado reported that, on March 14, 2013, Plaintiff's pain specialist, Dr. Nouriel Niamehr, D.O., had diagnosed Plaintiff with the following disorders: (1) "[c]omplaints of cervicoscapular pain secondary to MPS"; (2) "[c]hronic LBP secondary to MPS"; (3) "[m]ild bulging of L2-L3, L3-L4, L4-L5 and central disc protrusion L5-S1"; (4) "3 mm of retrolisthesis L5 on S1"; (5) "[c]hronic cervicalgia secondary to multilevel DDD at C5-C6, C6-C7"; (6) "[c]ervical spondylosis at C5-C6, C6-C7"; (7) "L C5 radiculitis history, intermittent"; (8) "[c]hemo-induced BUE/BLE peripheral neuropathy"; and (9) "[o]ther comorbidities" such as "[a]nxiety and depression" and "stage III adenocarcinoma of uterus status post THA."  (AR1361.) Dr. Corrado's report further commented that Plaintiff was given a CAD in May 2013, in which "she scored in the severe range on all four factors of depression," and that Plaintiff underwent a neuropsychological assessment in September 2011 that indicated that she suffers from a cognitive disorder.  (AR1361–62.)

1    Dr. Corrado's report also attacked Defendant's July 11, 2013 letter, noting that

2    the independent reviewer they relied upon "never evaluated or worked with"

3    Plaintiff, "completely ignored the objective findings that [Plaintiff] is suffering from

4    Major Depressive Disorder," and was "not an expert in Neuropsychology and ha[d]

5    no basis to draw any conclusions about [Plaintiff's] neuropsychological status."

6    (AR1363.)  Dr. Corrado stated affirmatively that he completely disagreed with

7    Defendant's rationale for terminating Plaintiff's LTD benefits, and in particular took

8    issue with Defendant's suggestion that Plaintiff was resistant to seeing a psychiatrist.

9    (AR1363.)  According to Dr. Corrado:

> Ms. Carrier was always willing to see a psychiatrist.  In fact, she was seen by Dr. Alan Karme, my colleague at Huntington Hospital, when she was an in-patient at Huntington Hospital.  Although she wanted to follow with Dr. Karme, he does not accept Aetnas [sic] insurance.  I personally referred Ms. Carrier to 10 different psychiatrists, all of whom declined to see her because they do not take her insurance. Finally, Ms. Carrier decided to see Dr. Karme on her own and to pay out of pocket.

15   (AR1363.)  Dr. Corrado then concluded by noting that Plaintiff's condition had not

16   improved but in fact had deteriorated since she was first granted LTD benefits by

17   Defendant in March 2013.  (AR1363.)

18       On October 7, 2013, Dr. Corrado sent Defendant a letter indicating that

19   Plaintiff remained under his care and that she was "temporarily totally disabled at

20   th[at] time and [wa]s not able to return to her work duties."  (AR1387–88.)  Dr.

21   Corrado also authored two Attending Physician Statements—dated September 17,

22   2013 and October 17, 2013—in which he opined that Plaintiff was disabled and was

23   "unable to work due to severe depression."  (AR1397, 1407.)  Also on October 17,

24   2013, Plaintiff's pain specialist, Dr. Niamehr, issued a report concluding that "it

25   [wa]s not appropriate for her to work at th[at] time."  (AR1458.)  On December 12,

26   2013, Plaintiff's attorney, Mr. Cooper, submitted these documents and others to

27   Defendant to support Plaintiff's appeal.  (*See* AR1413–14; *see also* AR1546–57.)

28

FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER COURT TRIAL

In considering Plaintiff's appeal, Defendant ordered several additional peer reviews.  First, Dr. Leonard Schnur, Psy.D., performed a peer evaluation of Dr. Corrado's findings on January 24, 2014.  (AR1615–21.)  The stated purpose of Dr. Schnur's analysis was to determine whether there was sufficient medical evidence to substantiate a functional impairment that would preclude Plaintiff from performing her own occupation or any occupation from July 11, 2013 through January 31, 2014.  (AR1619.)  Noting that the records from Dr. Corrado "in part predated the time period under consideration," Dr. Schnur concluded that Dr. Corrado's documentation "did not include a sufficient range of standardized measures of cognitive and emotional functioning to accurately substantiate the presence of an ongoing functional impairment to preclude the claimant from performing both the work of her own occupation or any occupation."  (AR1619.)  Dr. Schnur observed, however, that "it would be helpful to have a more recent [independent medical examination] from a neuropsychological standpoint to address the claimant's more current functioning during the time period under review."  (AR1619–20.)

Second, Dr. Malcolm McPhee, M.D., who specializes in pain management, completed another peer review on January 25, 2014.  (AR1623–27.)  In his review, Dr. McPhee summarized Plaintiff's medical maladies and provided several opinions related to her conditions.  For example, Dr. McPhee opined that Plaintiff's uterine cancer from 2009 likely "would not preclude work activity."  (AR1623.)  Similarly, Dr. McPhee observed that Plaintiff developed paclitaxel plus carboplatin-induced peripheral neuropathy that required a reduction in Plaintiff's dosage during chemotherapy, but then noted that "CP-induced neuropathy is a symmetrical, distal and predominantly sensory neuropathy that reverses after discontinuance of chemotherapy."  (AR1623.)  Consequently, Dr. McPhee concluded that Plaintiff's neuropathy condition "would not preclude sedentary work activity."  (AR1623.)  Finally, Dr. McPhee acknowledged Dr. Niamehr's reports regarding Plaintiff's pain in her neck, shoulders, upper chest, bilateral arms, middle back, low back, legs, and

13

thighs, and that Dr. Niamehr "described tenderness and hypersensitivity of the cervical and upper thoracic paraspinals with no neurological findings," yet Dr. McPhee concluded that "this condition would not preclude sedentary work activity for the time period in question." (AR1623.)

Lastly, Defendant ordered a peer evaluation by Dr. Tamara Bowman, M.D., who specializes in Internal Medicine and Endocrinology, which she completed on February 5, 2014. (AR1630–36.) Like Drs. Schnur and McPhee, Dr. Bowman concluded that there was insufficient documentation to substantiate a finding of functional impairment that would preclude Plaintiff from performing her job duties. (AR1534.) Specifically, Dr. Bowman concluded:

> Based on the provided documentation, there are insufficient clinical findings to support a level of functional impairment that would preclude performance of her sedentary physical demand job duties for the time period of 7/11/l3 through 1/31/14, from an internal medicine perspective. The claimant is documented to have chronic neck and low back pain. However, during the time period in question, despite her subjective complaints, there is a lack of physical exam findings documented to support a functional deficit for the clamant related to these complaints. Specifically, there is no documentation, during the time period under review, of quantifiable deficits in range of motion, motor weakness, focal sensory exam findings, abnormal reflexes, abnormal gait, joint deformity, or effusion, or synovitis. The only physical exam finding documented was the presence of tenderness to palpation over the cervical and thoracic paraspinal muscles. There is no documentation of clinical signs of neural compression on physical examination (or on imaging studies). The claimant's lab studies were within normal limits. Although there is reference to her having a history of asthma as well as an elevated blood pressure, there is no documentation of any signs of an acute exacerbation of asthma during the time period under review. Likewise, there is no indication that the claimant experienced any acute cardiac or neurologic symptomatology related to an elevated blood pressure in the claimant during the time period under review. Specifically, there is no documentation of a hypertensive urgency or emergency in the claimant. Although the claimant has a reported history of uterine cancer for which she underwent surgery in 2009, followed by a course of chemotherapy, there is no documentation of any recurrence of the claimant's uterine cancer at the present time, based on the submitted records.

(AR1634.) Based on this analysis, Dr. Bowman determined that, "from an internal medicine standpoint, there [we]re insufficient clinical findings to support a level of

functional impairment that would preclude [Plaintiff] from performing the sedentary physical demand duties of her own occupation from 7/11/13 through 1/31/14, on a full-time basis." (AR1634.)

Following these evaluations, Defendant informed Plaintiff on February 7, 2014 that it had decided to uphold its termination of her LTD benefits, effective July 11, 2013, based on its determination that there was insufficient medical evidence to support Plaintiff's continued disability pursuant to the "own occupation" standard under the policy. (AR1637–39.) In this letter, Defendant stated that much of Plaintiff's medical documentation predated the time period under review, and that this documentation "summarized her treatment history and although including a MOCA for depression, did not include a sufficient range of standardized measures of cognitive and emotional functioning to accurately substantiate the presence of an ongoing functional impairment to preclude work in her own occupation." (AR1638.)

Plaintiff has continued to be treated following Defendant's decision to uphold its termination of benefits to Plaintiff. On February 12, 2014, Dr. Corrado submitted another fax to Defendant observing that Plaintiff "[wa]s temporarily totally disabled at th[at] time and [wa]s not able to return to her work duties." (AR1640.) On April 10, 2014, Dr. Corrado submitted another Attending Physician Statement asserting the same conclusion. (AR1648.) Nevertheless, Defendant has made no payments under the policy following July 11, 2013. Believing this to be a wrongful withholding of benefits, Plaintiff filed this action on May 21, 2014. (Dkt. No. 1.)

## III.   CONCLUSIONS OF LAW

### A.   Legal Standard of Review

When Congress enacted ERISA, it did so to protect the "interests of participants in employee benefit plans and their beneficiaries." 29 U.S.C. § 1001(b). To this end, ERISA requires employers and plan administrators to provide participants with certain information about their benefits plans. It also permits a participant to file a civil action in federal court to challenge a denial of benefits under

15

a benefits plan.  *Id.* § 1132(a)(1)(B); *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008).  When presiding over such a cause of action, and reviewing a plan administrator's decision to deny benefits to a participant, a district court applies one of two standards of review: it reviews the decision either *de novo* or for an abuse of discretion.  The default standard of review is *de novo*.  *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  A court reviews for abuse of discretion where the plan itself provides for it or otherwise grants the administrator discretionary authority to determine a participant's eligibility for benefits.  *Metro. Life Ins.*, 554 U.S. at 111.  Here, the parties agree that the proper standard of review is *de novo*.  (Pl.'s Trial Br. at 18–20; Def.'s Trial Br. at 17.)

Accordingly, the Court must review the record without deference to determine whether the plan administrator correctly terminated Plaintiff's benefits.  *See Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) ("If de novo review applies, . . . [t]he court simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits, without reference to whether the administrator operated under a conflict of interest.").

### B.  The Court Will Not Consider Plaintiff's Extrinsic Evidence

To begin, Plaintiff has submitted evidence, attached as Exhibit A to the Declaration of Christian J. Garris, that was not included in the Administrative Record.  (Dkt. No. 20-1 at 4–13.)  Ordinarily, in conducting *de novo* review of an administrator's decision, "only the evidence that was before the plan administrator at the time of determination should be considered."  *Opeta v. Nw. Airlines Pension Plan for Contract Emps.*, 484 F.3d 1211, 1217 (9th Cir. 2007); *accord Fleming v. Kemper Nat'l Servs., Inc.*, No. C-03-5135 MMC, 2005 WL 839639, at *16 (N.D. Cal. Apr. 11, 2005) ("At trial, the Court generally considers only 'the evidence that was before the plan administrator . . . at the time of the determination.'" (alteration in original) (quoting *Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan*, 46 F.3d 938, 944 (9th Cir. 1995))).  Nevertheless, a court may consider additional

16

evidence "when circumstances clearly establish that additional evidence is necessary to conduct an adequate *de novo* review of the benefit decision." *Mongeluzo*, 46 F.3d at 944 (quoting *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1025 (4th Cir. 1993)). Plaintiff agrees that the evidence she now seeks to admit was not presented to the plan administrator, but she nevertheless urges the Court to consider it now.

Specifically, Plaintiff seeks to introduce medical records from two doctors who treated Plaintiff—Drs. Steven Applebaum, M.D., and Donald Boger, M.D.—in addition to an MRI scan and bone density testing, none of which was presented to the plan administrator. (*See* Garris Decl. Ex. A.) According to Plaintiff, the Court should consider these materials because Defendant is to blame for failing to obtain them earlier. (Pl.'s Trial Br. at 24.) In support of this argument, Plaintiff notes that she (1) identified Dr. Applebaum and Dr. Boger as two of her treating physicians in a report she submitted to Defendant, (*see* AR0690), and (2) provided Defendant with authorization to obtain her medical records, (*see* AR1470–72).

As Defendant contends, however, it was *Plaintiff's* burden to establish that she was disabled before the plan administrator, not Defendant's. Plaintiff's disability policy explicitly states that LTD benefits will cease on "[t]he date [she] fail[s] to provide proof that [she] meet[s] the LTD test of disability." (AR1659.) Such language unequivocally places the burden of establishing disability on the insured, and courts have consistently upheld this practice as proper. *See, e.g.*, *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 63 F. Supp. 2d 1145, 1157 (C.D. Cal. 1999) ("It is not inappropriate for an insurance company to place an initial burden of proof on claimants."), *aff'd*, 370 F.3d 869 (9th Cir. 2004); *Sabatino v. Liberty Life Assurance Co. of Boston*, 286 F. Supp. 2d 1222, 1232 (N.D. Cal. 2003) ("The Court concludes that Plaintiff must carry the burden to prove that she was disabled under the meaning of the plan . . . ."); *see also Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1247 (11th Cir. 2008) ("Glazer bears the burden to prove that she is disabled."). Moreover, Plaintiff went to great lengths to satisfy this

burden by submitting numerous medical records from several other doctors by whom Plaintiff was being treated.  That Plaintiff (despite being represented by counsel) failed to present these medical records to the plan administrator does not justify considering extrinsic evidence.  *See Opeta*, 484 F.3d at 1217.

In *Opeta*, for example, the Ninth Circuit discussed the "exceptional circumstances" that justify admitting evidence not presented to the administrator below.  *Id.*  These circumstances included:

> claims that require consideration of complex medical questions or issues regarding the credibility of medical experts; the availability of very limited administrative review procedures with little or no evidentiary record; the necessity of evidence regarding interpretation of the terms of the plan rather than specific historical facts; instances where the payor and the administrator are the same entity and the court is concerned about impartiality; claims which would have been insurance contract claims prior to ERISA; and circumstances in which there is additional evidence that the claimant could not have presented in the administrative process.

*Id.* (quoting *Quesinberry*, 987 F.2d at 1027).  Plaintiff has not argued, let alone established, that any of these circumstances are present here.  And while these enumerated circumstances are not exhaustive, *see id.*, Plaintiff has not provided any reason why the circumstances here are similarly "exceptional."  Plaintiff does not suggest, for example, that she somehow lacked access to these medical records at the time of the administrator's decision.  Rather, it appears that she simply did not think to include this evidence.  Given the Ninth Circuit's admonition that "a district court should not take additional evidence merely because someone at a later time comes up with new evidence," the Court declines to consider Exhibit A to the Declaration of Christian Garris.  *Opeta*, 484 F.3d at 1217.

## C.   **Defendant Improperly Terminated Plaintiff's Benefits**

Because the standard of review is *de novo*, Plaintiff bears burden of proving entitlement to benefits.  *Muniz v. Amec Constr. Mgmt. Inc.*, 623 F.3d 1290, 1294 (9th Cir. 2010).  Consequently, to demonstrate that she is entitled to benefits, Plaintiff must establish that she fit the definition of "disability" under the policy during the

18

time period of July 11, 2013 to January 31, 2014.  At the time Defendant terminated Plaintiff's benefits, the applicable definition for disability remained the "own occupation" definition (until August 10, 2013).  (*See* AR1218–19.)  Accordingly, Plaintiff must demonstrate that, during the time period in question, she could not perform the material duties of the occupation that she was "routinely performing when [her] period of disability" began, viewed as that occupation is normally performed in the national economy.  (AR1658, 1673.)  As reflected by the Administrative Record, the material duties of Plaintiff's job include little physical activity, but the following responsibilities: "[c]ommunicat[ing] risk analysis clearly through written and oral communication," "[i]dentify[ing] problems on credit-related issues, guidelines & policies," performing research on closed loans, and supervising between twenty and 100 people across multiple states.  (AR0503, 0694.)  Accordingly, Plaintiff must demonstrate that her condition prohibited her from performing these duties.

Much of Plaintiff's argument on this basis focuses on the thorough neuropsychological testing that Dr. Corrado performed on Plaintiff in September 2011 to evaluate Plaintiff's condition.  As discussed above, that testing revealed that Plaintiff "performed poorly on tasks which tapped working memory," that she demonstrated "deficits in executive functioning," and that she "me[t] the diagnostic criteria for pain disorder," which led Dr. Corrado to conclude that Plaintiff "should be considered totally disabled on a psychiatric basis at th[at] time."  (AR1114, 1117, 1118.)  Defendant makes much of the fact that Dr. Corrado performed these tests roughly two years before the time period in question.  Indeed, the time that has elapsed since these tests were performed does undercut their reliability.  It is quite possible, for example, that a patient treated for Plaintiff's symptoms would exhibit significant improvement over a period of two years.  Here, however, the Administrative Record suggests that the opposite occurred.  In his August 15, 2013 report, for example, Dr. Corrado opined that Plaintiff's mental and physical

1   condition had actually deteriorated since she first received began receiving LTD

2   benefits from Defendant.  (AR1363.)

3          In addition, Dr. Corrado performed an analysis of Plaintiff's abilities related to

4   work function in this report, detailing her impairment level as of August 15, 2013—

5   well within the timeframe at issue here.  Dr. Corrado concluded that Plaintiff was at

6   that time suffering moderate or severe impairment with regard to the following

7   functions related to work: (1) the ability to comprehend and follow instructions,

8   (2) the ability to perform simple and repetitive tasks, (3) the ability to maintain a

9   work pace appropriate to a given workload, (4) the ability to perform complex and

10  varied tasks, (5) the ability to influence people, (6) the ability to make

11  generalizations, evaluations, or decisions without immediate supervision, and (7) the

12  ability to accept and carry out responsibilities for direction, control, and planning.

13  (AR1362–63.)  Dr. Corrado stated that this analysis was "based on clinical

14  interviewing, observation, and objective test findings."  (AR1363.)

15          In fact, Dr. Corrado has consistently found Plaintiff to be disabled based on

16  the same cognitive deficiencies that he found after performing the September 2011

17  tests.  For example, on December 13, 2011, Dr. Corrado noted that he assisted

18  Plaintiff in filling out her state disability benefits forms because she was "having a

19  hard time completing activities of daily living."  (AR1278–79.)  On January 10,

20  2012, Dr. Corrado commented that Plaintiff was "having a difficult time even

21  performing her activities of daily living," and that she was "not taking care of her

22  affairs."  (AR1276.)  On July 26, 2012, Dr. Corrado wrote to Defendant to complain

23  about the deadlines that Defendant wished Plaintiff to meet to retain benefits,

24  observing that this was "an unreasonable expectation given [Plaintiff's] physical,

25  psychiatric, as well as neurocognitive deficits."  (AR1253.)  On September 7, 2012,

26  Dr. Corrado wrote that, "[i]n terms of her cognitive functioning, [Plaintiff]

27  exhibit[ed] difficulty concentrating," and that she "was only able to remember two

28  words after a three-minute delay."  (AR1242.)  On September 21, 2012, Dr. Corrado

1   opined that Plaintiff was "totally disabled" due to "significant cognitive deficits

2   which would preclude her from working."  (AR1241.)  On May 8, 2013—two

3   months before Defendant terminated Plaintiff's benefits—Dr. Corrado noted that

4   Plaintiff was suffering the following cognitive impairments at the time: "Inability to

5   think [and] sustain concentration . . . severe memory problems [and] impairment."

6   (AR1332.)  He further concluded at that time that, based on her CAD scores,

7   Plaintiff was at "[v]ery [s]ignificant [c]linical [r]isk" of suffering cognitive and

8   physical fatigue.  (AR1333.)  And, as discussed above, Dr. Corrado repeated these

9   findings in his August 15, 2013 report.  (AR1361–62.)

10          Dr. Corrado's periodic monitoring of Plaintiff thus consistently led him to

11   determine that Plaintiff remained cognitively impaired from the time that he

12   administered the cognitive testing to the timeframe in question.  Owing to the need to

13   communicate effectively, perform research, and supervise others as a Credit

14   Administrator, the cognitive deficiencies identified by Dr. Corrado make it highly

15   unlikely that Plaintiff could perform the material duties of her occupation.

16   Accordingly, Dr. Corrado's reports provide persuasive evidence that Plaintiff was

17   disabled during the applicable timeframe.[3]

18          Defendant, of course, presented the conclusions of several doctors who

19   disagreed with Dr. Corrado's findings after conducting peer reviews.  Plaintiff

20   challenges these reviews in part on the basis that none of these doctors ever treated

21   Plaintiff or even examined her in person.  Indeed, they performed their analyses

22   based on the medical examinations performed and records kept by Dr. Corrado.  As

23   Defendant argues, however, Defendant was not required to send a doctor to perform

24   an in-person examination of Plaintiff.  *See Brown v. Conn. Gen. Life Ins. Co.*, No. C

25   13-5497 PJH, 2014 U.S. Dist. LEXIS 175112, at *37–38 (N.D. Cal. Dec. 17, 2014)

26

27   _____

[3] Defendant makes much of certain excerpts from the Administrative Record that suggest that
Plaintiff did not wish to return to her job at Bank of America.  (*See* Def.'s Trial Br. At 18–19.)  But
28   if Plaintiff did not like her job, that is wholly irrelevant to the sole issue presented here of whether
Plaintiff fits the policy's definition of disability.

("[W]hen the court reviews a plan administrator's decision *de novo*, the burden of proof remains with the claimant to establish that he/she is entitled to benefits and does not shift back to the administrator once the claimant has advanced some evidence to support his/her claim, as plaintiff suggests in arguing that [defendant] was obligated to arrange for an in-person medical examination rather than relying on the analysis of the file by its in-house nurse reviewer and in-house psychiatrist." (internal citation omitted)).  Similarly, the Court does not grant deference to Dr. Corrado's conclusions simply because he is the physician who has been treating Plaintiff.  *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003) ("Nothing in [ERISA] suggests that plan administrators must accord special deference to the opinions of treating physicians.").

Nevertheless, the Court finds Dr. Corrado's conclusions sounder than those presented by the peer reviewers.  Many of the opinions rendered by these reviewers are presented in conclusory fashion, making it unclear how they reached such starkly contrasting results from those of Dr. Corrado despite reviewing the same materials.  For example, Dr. Mendelssohn's report largely summarizes the results of Dr. Corrado before simply concluding that there was "a lack of specific examination findings and behavioral observations to clearly substantiate the claimant's current cognitive functioning." (AR1346–47.)  The greatest detail she provides in her review concerns a perceived discrepancy between Dr. Corrado's characterization of Plaintiff's suicidal tendencies and his notes on the subject.  Specifically, Dr. Corrado wrote in his notes that Plaintiff "continue[d] to feel suicidal and ha[d] a plan" but that she promised not to harm herself, but in a phone call with Dr. Mendelssohn he stated that she was "extremely suicidal." (AR1336, 1347.)  The Court does not find this discrepancy material, particularly given that his notes clearly corroborate that Plaintiff was suffering from suicidal inclinations.

In her review, Dr. Bowman concluded that there were "insufficient clinical findings to support a level of functional impairment that would preclude performance

of her sedentary physical demand job duties," but she did not address the troublesome cognitive deficiencies identified by Dr. Corrado.  (AR1634.)  And while Dr. Schnur—a psychologist—determined that Dr. Corrado's documentation "did not include a sufficient range of standardized measures of cognitive and emotional functioning to accurately substantiate the presence of an ongoing functional impairment," he also indicated that it would be helpful to obtain an additional independent medical examination "from a neuropsychological standpoint to address the claimant's more current functioning during the time period under review." (AR1619–20.)  No additional examination was performed.  That is not to say that Defendant had a duty to conduct such an examination; as discussed above, Defendant was under no such obligation.  Yet Dr. Schnur's indication that he needed more information to provide a full opinion undercuts his report as a rebuttal to Dr. Corrado's opinions that were based on his frequent periodic monitoring of Plaintiff. Accordingly, the Court finds Dr. Corrado's conclusions more reliable than those presented by Drs. Mendelssohn, Schnur, and Bowman.[4]

Plaintiff has also identified evidence in the Administrative Record that she was suffering debilitating pain that impaired her ability to perform the minimal physical tasks required by her occupation.  Specifically, on October 17, 2013— several months after Defendant terminated Plaintiff's benefits—Plaintiff's pain specialist, Dr. Niamehr, issued a report concluding that "it [wa]s not appropriate for her to work at th[at] time" because Plaintiff was suffering from (1) cervicalgia, (2) cervical facet syndrome, (3) hip pain, (4) low back pain, and (5) peripheral

---

[4] In doing so, the Court notes that in its July 11, 2013 letter, Defendant disingenuously indicated that Defendant's "independent reviewer (*Psychiatrist*)" disagreed with Dr. Corrado's opinions with regard to Plaintiff's disability.  (AR1351 (emphasis added).)  Given that Dr. Mendelssohn was the only doctor who had performed a peer review by that point, it is presumably her to whom Defendant was referring.  Yet Dr. Mendelssohn is not a psychiatrist, as Defendant's termination letter indicates parenthetically.  Rather, Dr. Mendelssohn holds a doctorate in psychology (a Psy.D.) and, according to Defendant, specializes in "Clinical Psychology and Neuropsychology." (*See* Def.'s Trial Br. at 9.)  Defendant's attempt to suggest otherwise is troubling.

FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER COURT TRIAL

1   neuropathy, secondary to drugs or chemo.[5]  (AR1458.)  Yet the fact that Plaintiff was

2   diagnosed with a medical disorder does not automatically render her disabled.[6]  And

3   Defendant provided the report of Dr. McPhee—a medical doctor who specializes in

4   pain management—who opined that Plaintiff's pain in her neck, shoulders, upper

5   chest, bilateral arms, middle back, low back, legs, and thighs, in addition to her

6   tenderness and hypersensitivity of the cervical and upper thoracic paraspinals,

7   "would not preclude sedentary work activity for the time period in question."

8   (AR1623.)  As neither Dr. Niamehr nor Dr. McPhee provide much reasoned analysis

9   supporting their opposing conclusions, the Court cannot conclude that Defendant

10   improperly relied on Dr. McPhee's conclusions, particularly given the minimal

11   physical activity necessary to perform Plaintiff's occupation.

12          Nevertheless, based on Plaintiff's cognitive deficiencies identified by Dr.

13   Corrado, the Court finds that Plaintiff has satisfied her burden of establishing that

14   she fits the definition of disability under the "own occupation" standard pursuant to

15   Defendant's policy.  The Administrative Record demonstrates that Plaintiff's

16   cognitive impairment hinders her ability to perform the material duties of her

17   occupation of Credit Administrator, including written and oral communication,

18   problem solving, performing research, and supervising other employees.  (*See*

19   AR0503, 0694.)  Defendant thus improperly terminated Plaintiff's benefits on July

20   11, 2013.

21

22   _____

23   [5] Dr. Niamehr indicated that Plaintiff's cervicalgia and cervical facet syndrome were symptomatic at the time, whereas the hip pain, low back pain, and peripheral neuropathy were stable. (AR1458.)

24
25   [6] *See Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 880 (9th Cir. 2004) ("That a person has a true medical diagnosis does not by itself establish disability."), *overruled on other grounds by Abatie*, 458 F.3d 955; *Perryman v. Provident Life & Accident Ins. Co.*, 690 F.

26   Supp. 2d 917, 943 (D. Ariz. 2010) ("[A] mere diagnosis of a condition such as CFS is not determinative of disability for purposes of ERISA disability benefits . . . ."); *Seitles v. UNUM*

27   *Provident*, No. CIV S-04-2725 FCDDAD, 2009 WL 3162219, at *8 (E.D. Cal. Sept. 29, 2009) ("The Ninth Circuit has recognized repeatedly that merely because a person has a true medical

28   diagnosis does not by itself establish disability." (internal modifications and quotation marks omitted)).

Defendant's remaining arguments do not alter this result.  For example, Defendant argues that the Court should afford its decision deference because Defendant engaged in a good-faith exchange of information with Plaintiff.  (Def.'s Trial Br. at 20.)  Indeed, when applying an abuse of discretion standard, if "an administrator can show that it has engaged in an ongoing, good faith exchange of information between the administrator and the claimant, the court should give the administrator's decision broad deference notwithstanding a minor irregularity." *Abatie*, 458 F.3d at 972 (internal quotation marks omitted).  But the parties both agree that *de novo* review applies here, which reduces the Court's role simply "to evaluat[ing] whether the plan administrator correctly or incorrectly denied benefits, without reference to [a procedural irregularity such as] whether the administrator operated under a conflict of interest."  *Id.* at 963.

Finally, Defendant argues that the Court should determine Plaintiff's disability to be primarily psychological, thus subjecting her benefits to a mental health limitation in the policy.  (Def.'s Trial Br. at 21–22.)  Because this was not the basis for Defendant's termination of Plaintiff's benefits, however, it would not be a proper basis on which to uphold Defendant's decision.  *See, e.g.*, *Jebian v. Hewlett-Packard Co. Emp. Benefits Org. Income Prot. Plan*, 349 F.3d 1098, 1104–05 (9th Cir. 2003) ("[A] contrary rule would allow claimants, who are entitled to sue once a claim had been 'deemed denied,' to be 'sandbagged' by a rationale the plan administrator adduces only after the suit has commenced.  Our refusal to subject claimants to that eventuality parallels the general rule that an agency's order must be upheld, if at all, on the same basis articulated in the order by the agency itself, not a subsequent rationale articulated by counsel." (internal quotation marks and citation omitted)).

**D.** **The Court Remands This Action to the Plan Administrator to Make a Factual Determination Under the "Any Reasonable Occupation" Standard for LTD Benefits Subsequent to August 10, 2013**

The policy requires that as of August 10, 2013, a different standard apply to Plaintiff's LTD benefits; that standard incorporates a definition of disability that the medical opinions did not address—the "any reasonable occupation" standard. (AR1218–19.)

Although Defendant cites Ninth Circuit authority for the proposition that the Court must remand the case for Aetna's review, these cases are inapposite because they apply the abuse of discretion standard. *Saffle v. Sierra Pac. Power Co.*, 85 F.3d 455, 456 (9th Cir. 1996) ("We now make it explicit, that remand for reevaluation of the merits of a claim is the correct course to follow when an ERISA plan administrator, *with discretion to apply a plan*, has misconstrued the Plan and applied a wrong standard to a benefits determination.") (emphasis added); *Patterson v. Hughes Aircraft Co.*, 11 F.3d 948, 949–50 (9th Cir. 1993) (highlighting that the "district court's review of the plan administrator's decision for abuse of discretion was . . . proper" and remanding to the plan administrator for a factual determination as to cause of claimant's disability).

In at least one instance where a district court engaged in *de novo* review, the Ninth Circuit gave discretion "to the district court whether to remand to the plan administrator for an initial factual determination." *Mongeluzo v. Baxter Travenol Long Term Disability Ben. Plan*, 46 F.3d 938, 944 (9th Cir. 1995). Although the Court has such discretion, remand is appropriate here. *See Canseco v. Constr. Laborers Pension Trust for S. Cal.*, 93 F.3d 600, 609 (9th Cir. 1996) (concluding it would be inappropriate to remand "[o]n the facts of [that] case" because "no factual determinations remain[ed] to be made"). Neither Plaintiff's nor Defendant's doctors have applied the "any reasonable" standard to Plaintiff's case; there is nothing in the Administrative Record for the Court to resolve this factual issue. The Court is not

willing to supplant the opinion of a medical expert to make this determination. This action is thus remanded to the plan administrator—only in regard to Plaintiff's LTD benefits subsequent to August 10, 2013—to determine whether Plaintiff meets the definition of "disability" under the "any reasonable occupation" standard, consistent with this opinion.

## IV. **CONCLUSION**

The Court thus finds that Defendant improperly terminated Plaintiff's LTD benefits on the basis that she was able to perform the material duties of her own occupation. Defendant is thus **ORDERED** to pay Plaintiff LTD benefits for the time period between July 11, 2013 and August 10, 2013. The Court further **REMANDS** this action to the plan administrator to determine, consistent with the factual findings and legal conclusions stated herein, whether Plaintiff meets the definition of "disability" under the "any reasonable occupation" standard, such that she should also be provided with LTD benefits subsequent to August 10, 2013.

Judgment is for Plaintiff.


Dated: July 24, 2015

_____
Beverly Reid O'Connell
United States District Judge